UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

JEFFREY GRIEBEL,

Plaintiff,

-against-

BEYOND AIR, INC.,

Defendant.

---------------------------------------------------------------------x

Case No.
25-cv-2969(AMD)(ST)

**<u>DECLARATION OF JOHN MORR IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>**

JOHN MORR, hereby declares under penalty of perjury as follows:

1. I am the Head of Human Resources for defendant, Beyond Air, Inc. ("Beyond Air"). As the Head of Human Resources, I am familiar with the record keeping practices of Beyond Air. I make this declaration based on my personal knowledge and based on the business records maintained by Beyond Air, which are referenced and annexed herein. I submit this declaration in support of Beyond Air's motion to dismiss the complaint filed by plaintiff, Jeffrey Griebel under Sections 740 and 741 of the New York Labor Law because Mr. Griebel, a resident of Colorado, had minimal contact with the state of New York during his employment with Beyond.

***Beyond Air is a Publicly Traded Company Incorporated in Delaware***

2. Beyond Air is a publicly traded commercial-stage medical device and biopharmaceutical company developing a platform of nitric oxide generators and delivery systems capable of generating nitric oxide from the ambient air.

3. Beyond Air is a Delaware company with offices in Garden City, New York, and in Madison, Wisconsin. International offices are located in Dublin, Ireland and Rehovot, Israel.

***Jeffrey Griebel's Employment with Beyond Air***

4. Plaintiff, Jeffrey Griebel ("Plaintiff' or "Griebel") was employed by Beyond Air as the Director of Clinical Services from December 13, 2021 until December 31, 2024. Plaintiff was provided with an offer letter, a copy of which is annexed hereto as **Exhibit A**. The offer letter included an "At-Will Employment and Confidentiality Agreement" (the "Agreement"). The Agreement requires that Plaintiff maintain Beyond Air's confidential and trade secret information confidential, and contained certain restrictions on the solicitation and job activities of Plaintiff following his employment at Beyond Air. *See* Agreement, **Exhibit A**, at ¶3. The Agreement has a choice of law provision providing that the Agreement (inclusive of Plaintiff's post-employment restrictions) are governed by New York law and would be litigated in New York. *See* Agreement, **Exhibit A**, at ¶6.

5. As reflected on the job description, Plaintiff was a remote worker who worked out of his home office in Colorado. *See* **Exhibit B.** As a remote employee, Plaintiff's contacts with Beyond Air's headquarters in New York was very limited. Indeed, in his 3 years of employment (1,114 days), Plaintiff visited Beyond Air's New York Offices and New York based customers a total of 33 days (or around 2.98% of his employment). In the two years before Plaintiff was terminated, Plaintiff was in New York only 8 days in total: 4 days in 2024 from July 15 – 18, and 4 days in 2023 from April 10-13. These contacts are all reflected in the expense reports maintained by Beyond Air. A copy of these records is annexed hereto as **Exhibit C**.

6. Further, a chart summarizing Plaintiff's contacts, as reflected in the expense reports, are annexed hereto as **Exhibit D**. This expense report proves every time Plaintiff was in New York. There are no other dates.

***Plaintiff's Complaint in December 2024***

7. At the heart of his complaint is an email exchange between Plaintiff and Beyond Air's CEO, Steve Lisi that took place on December 14, 2024. In this email exchange, Mr. Lisi criticized Plaintiff and his team for replacing a UTSW system on a Saturday when the system had 800 hours and could have been replaced during the following work week. Mr. Lisi advised that this overnight, weekend delivery was expensive and unnecessary. In response, Plaintiff stated:

> I went back through the history of UTSW CFI's this weekend as I wanted to get the complete story. The request ended up being one device for Maintenance Due (which doesn't make it any better), but the original request had the wrong SN, so another email was sent to update (which is why it looked like two devices). There was a second device (569) that went into Main Delivery Failure on a patient, the hospital is asking for feedback on the device issue as they must do their own investigation (it looks like a compressor or internal leak). Both devices were requested as a "non-urgent" swap by the CS. We have been operating under the following guidelines: When a CFI comes is submitted, it is designated as Urgent or Non-Urgent based on what customer information is supplied. Urgent is considered within 6 hours (or as close as possible) or Non-Urgent (within 24 hours) unless otherwise specified. The hospital was offered Monday and requested Sunday as they stated they had a lot of machines running. We can readdress the non-urgent request time frame (especially regarding the weekend). I can talk to Derek and Rob about inquiring about the number of devices available at the hospital prior to agreeing to moving a device on a weekend, we can come up with some reasonable guidelines. I will also talk to the CS team about the weekend situation when we get these calls. We do instruct hospitals that they have at least 8 days of therapy (if not more) when the alert goes off. Occasionally we also get the 292-day alert with very low hours on the plasma chamber (last one I saw was around 149 hours).

*See* **Exhibit D**.

8. This is nothing more than a routine business discussion about costs and procedures. There is nothing in this exchange that alleges that there has been a violation of statute or regulation.

***Plaintiff's Termination from Beyond Air***

9. Plaintiff was terminated in December 2024, as part of an overall effort by Beyond Air to downsize its workforce by 50%. Indeed, Beyond Air's total employee count on March 31, 2024 was 107, and by March 31, 2025, its total employee count was reduced to 61. This initiative was necessary to preserve capital as the Company stock has gone down from a pre-reverse split adjusted value of $189.40 per share on December 31, 2021 when Plaintiff was hired to the equivalent of $7.17 per share on December 31, 2024, the last day of Plaintiff's employment. The stock is now $0.91 per share. Plaintiff's role was assumed by his subordinate.

***Plaintiff Receives Unemployment Benefits from Colorado***

10. Following his termination of employment, Plaintiff received unemployment benefits from the state of Colorado. *See* **Exhibit E**. Colorado, as Plaintiff's residence, is the state that was impacted by and has the most interest in his termination and was the state that issued unemployment benefits.

11. Given the above, Plaintiff's whistleblower complaint must be dismissed because: (a) Plaintiff as a remote work who had very limited contact with New York state; (b) is not a health care employee; and (c) he failed to make a complaint that would provide protections from the NYLL §§740 or 741.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 22, 2025

JOHN MORR