**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY GRIEBEL,<br><br>Plaintiff,<br><br>-against-<br><br>BEYOND AIR, INC.,<br><br>Defendant. | Case No. 25 Civ. 02969 (AMD) |

**PLAINTIFF JEFFREY GRIEBEL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BEYOND AIR, INC.'S MOTION TO DISMISS**

OTTERBOURG P.C.
Richard G. Haddad
Alessandra M. Dagirmanjian
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Email: rhaddad@otterbourg.com

*Attorneys for Plaintiff Jeffrey Griebel*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

THE COMPLAINT AND PROCEDURAL HISTORY ..... 4

A. The Parties ..... 4

B. Defendant Ignores Harm to Patients and Hospital Staff Caused by the LungFit PH Device ..... 6

C. Defendant Continues to Act Recklessly to Try to Stay Competitive in its Industry ..... 8

D. Independent Corroboration of the Ongoing Failures of Defendant's LungFit PH Device ..... 9

E. Plaintiff is Terminated for Raising Concerns About Health Risks ..... 10

F. This Action ..... 13

ARGUMENT ..... 13

I. STANDARD OF REVIEW ..... 13

II. PLAINTIFF HAS STATED A CLAIM PURSUANT TO §§ 740 AND 741 OF THE NYLL ..... 16

A. The New York Labor Law Applies to Plaintiff's Claims ..... 16

B. Section 741 of the NYLL Applies to Plaintiff's Claims ..... 21

C. Plaintiff has More than Adequately Alleged Whistleblowing Activity for Which Beyond Air Terminated his Employment ..... 23

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arazi v. Cohen Bros. Realty Corp.*,
2022 WL 912940 (S.D.N.Y. Mar. 28, 2022) ....23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....14

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ....14

*Faulkner v. Beer*,
463 F.3d 130 (2d Cir. 2006) ....14

*Fried v. LVI Servs., Inc.*,
500 F. App’x 39 (2d Cir. 2012) ....20

*Garcia v. ROC Nation LLC*,
2025 WL 1865965 (S.D.N.Y. July 2, 2025) ....21

*Goshen v. Mut. Life Ins. Co. of New York*,
286 A.D.2d 229 (1st Dept 2001), aff'd, 98 N.Y.2d 314 (2002) ....19

*Hammell v. Paribas*,
1993 WL 426844 (S.D.N.Y. Oct. 22, 1993) ....19

*Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*,
2006 WL 2356157 (S.D.N.Y. Aug. 9, 2006) ....19

*Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*,
2015 WL 5567073 (E.D.N.Y. Sept. 21, 2015) ....19

*Hobbs v. Knight-Swift Transportation Holdings, Inc.*,
2025 WL 1577271 (S.D.N.Y. June 4, 2025) ....18

*Hoffman v. Parade Publications*,
15 N.Y.3d 285 (2010) ....20

*Magnuson v. Newman*,
2013 WL 5380387 (S.D.N.Y. Sept. 25, 2013) ....19

*Manfredonia v. Am. Airlines, Inc.*,
68 A.D.2d 131 (2d Dept 1979) ....................19

*Meilus v. Rest. Opportunities Ctr. United, Inc.*,
2021 WL 4868557 (S.D.N.Y. Oct. 15, 2021) ....................20

*Moynihan v. New York City Health & Hosps. Corp.*,
120 A.D.3d 1029 (1st Dept 2014).................... 22-23

*Murray v. Brag Sales Inc.*,
2024 WL 4635479 (S.D.N.Y. Oct. 31, 2024) ....................20

*O'Neill v. Mermaid Touring Inc.*,
968 F. Supp. 2d 572 (S.D.N.Y. 2013) ....................17, 19

*Reddington v. Staten Island Univ. Hosp.*,
373 F. Supp. 2d 177 (E.D.N.Y. 2005) ....................22

*Saget v. Trump*,
345 F.Supp.3d 287 (E.D.N.Y. 2018) ....................14

*Sharkey v. Quarantillo*,
541 F.3d 75 (2d Cir. 2008)....................14

*Smith v. Vera Inst. of Just., Inc.*,
2023 WL 11879682 (E.D.N.Y. Aug. 11, 2023)....................20

*In re Stage Presence, Inc.*,
559 B.R. 93 (Bankr. S.D.N.Y. 2016)....................19

*Von Maack v. Wyckoff Heights Med. Ctr.*,
140 A.D.3d 1055 (2d Dept 2016) ....................23

**<u>Statues and Rules</u>**

Fed. R. Civ. P. 12(b)(1)....................1, 13

Fed. R. Civ. P. 12(b)(6).................... 13-14

Fed. R. Civ. P. 15(a)(2)....................25

N.Y. Gen. Bus. Law § 349(h) ....................19

N.Y. Exec. Law § 290(2) ....................20

N.Y. Gen. Oblig. Law § 11-101....................19

NYLL § 198(1-a) .......... 19

NYLL § 650 .......... 18

NYLL § 740 .......... 1, 13, 15, 16, 23

NYLL § 740(4)(c) .......... 15

NYLL § 741 .......... 1, 4, 13, 15, 16, 21-23

NYLL § 741(1)(a) .......... 21

NYLL § 741(1)(d) .......... 21

NYLL § 741(5) .......... 15

**Other Authorities**

2019 New York Assembly Bill No. 375 .......... 18

New York Bill Jacket, 2002 A.B. 9454, Ch. 24 .......... 21

Plaintiff Jeffrey Griebel respectfully submits this Memorandum of Law in Opposition to Defendant Beyond Air, Inc.'s ("Beyond Air") motion to dismiss the Amended Complaint, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure (the "Motion").

## PRELIMINARY STATEMENT

The Motion to Dismiss should be denied because:

(a) The offer letter Beyond Air sent to Mr. Griebel confirmed that his employment was "based out of [Beyond Air's] Garden City, NY office."

(b) The employment agreement (prepared by Defendant) is in "all respects" to be "interpreted, governed and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law."

(c) Any dispute relating to the employment agreement "or the subject matter of" the agreement, including "breach, termination or validity of [the agreement]" "can be brought only in a federal or state court in New York."

(d) Beyond Air created business cards and an email signature block for Plaintiff listing its Garden City, New York address as the exclusive work address for Mr. Griebel.

(e) The Complaint indisputably pleads every element of a claim under New York Labor Law Section 740 and 741 for whistleblower retaliation.

(f) No case cited by Defendant has dismissed a whistleblower case under NYLL 740 or 741 on the facts pleaded here—as none of the cases cited by Defendant involves the important public policy considerations inherent in whistleblower protection. Cases decided under other statutes do not apply here.

(g) To the extent that Defendant offers an economic justification or necessity defense (which Plaintiff would contend is a mere pretext) such a defense would need to be pleaded and proven, and is not a proper basis for a motion to dismiss.

(h) Similarly improper on a motion to dismiss, is Defendant's submission of, and reliance on, a fact affidavit seeking to argue economic issues or to try to explain or spin a single email Defendant introduced on this Motion. To the extent any of this is relevant, it would need to be pleaded and proven at trial, and is not a basis for a motion to dismiss. Nor is consideration of summary judgment appropriate at this time, because among other things Beyond Air has not ever responded to Plaintiff's discovery requests.

Plaintiff is a former employee of Beyond Air, a Garden City, New York biopharmaceutical and critical care company that manufactures Inhaled Nitric Oxide generators (the "LungFit PH Device"), used for critically ill patients, including premature infants. Throughout, and until the end of his employment, Plaintiff complained about numerous unsafe and unlawful practices by Beyond Air, which its senior management, including its Chief Executive Officer, was aware of. These included: (1) Beyond Air's continuing to issue LungFit PH Devices to hospitals despite knowing a circuit board component would overheat and melt resulting in devices smoking in the patients' rooms imperiling patients and clinicians alike; (2) continuing to issue new versions of the LungFit PH Devices that provided inaccurate nitric oxide sensor readings due to a software defect; (3) effectively forcing hospitals to rely on nearly expired filters for their LungFit PH Devices and refusing to supply them with filters with a reasonable shelflife; and (4) providing improperly validated accessories for the LungFit PH devices that had not gone through the proper procedures required for FDA approval for hospital use.

Notably, even though Defendant asserts on its Motion that Plaintiff fails to state a claim, Defendant entirely ignores the above allegations, and argues instead that Plaintiff's email to the CEO, sent one day before his termination and rejecting the CEO's proposal not to replace a Beyond Air device after a hospital report, was not whistleblowing. Defendant cites as support for this argument, an outside-the-pleading declaration from Beyond Air's head of human resources John Morr, supposedly interpreting that email, which Mr. Morr was not even copied on. Thus, Plaintiff has more than alleged that Beyond Air engaged in unlawful practices, which Plaintiff complained about, and once this came to the attention of the CEO (the week before Christmas 2024), he was summarily fired. Defendant has not, and cannot, demonstrate otherwise.

Despite its offer letter to Plaintiff telling him that his position was "based out of our Garden City, NY office" and his employment agreement requiring the application of New York law, Defendant further asserts that New York's whistleblower protection under the Labor Law does not apply to Plaintiff's claims, because Plaintiff was allegedly employed in Colorado, rather than New York, purely on the basis of his residence in Colorado. But Defendant cites only one case that concerns a *retaliation* claim under the NYLL (citing mostly cases concerning NYLL wage provisions or the New York Human Rights law, which have entirely different policy and practical implications) and even that case did not concern the facts here where Plaintiff was employed in New York, traveled a significant amount to New York, and worked remotely, travelling across the country at Beyond Air's direction to various hospital customers. Even if this Court were to hold the NYLL does not apply to Plaintiff's claims, it would only require the application of Colorado law to the wrongful termination, not that Plaintiff bring his claims in Colorado as Defendant suggests—because the contract expressly provides that "[i]f a dispute arises out of or in connection with this Agreement or the subject matter of this Agreement, including, without limitation,

regarding the . . . termination . . . of this Agreement, Employee agrees that a claim can be brought only in a federal or state court in New York."

Finally, Beyond Air incorrectly asserts that NYLL Section 741 does not apply here, because Plaintiff did not provide healthcare services, even though Plaintiff, as reflected in the job description that Beyond Air itself submits with this Motion, was responsible for overseeing and reporting patient incidents, and making knowledgeable judgments about patient care related to Beyond Air's devices. Section 741 was enacted to provide employees in the precise position that Plaintiff was in, with the ability to report, without retaliation, employer practices that risk patient safety. To deny Plaintiff a claim pursuant to this provision would be to nullify its intended effects.

For the foregoing reasons, and as set forth more fully herein, Defendant's Motion should be denied in its entirety.

## <u>THE COMPLAINT AND PROCEDURAL HISTORY</u>

### *A. The Parties*

Defendant is a New York-headquartered biopharmaceutical and critical care company that manufactures Inhaled Nitric Oxide generators (the "LungFit PH Device"), which are used by hospitals to treat critically ill patients, including infants. Amended Complaint [Dkt. 7] ("Amend. Cmplt.") ¶¶ 2; 10. The LungFit PH device has an FDA approval for newborn infants with pulmonary hypertension which has a high mortality rate if not treated rapidly. *Id.* ¶ 2.

Plaintiff is the former Director of Clinical Services for Defendant, responsible for overseeing the use of the LungFit PH Devices and communicating with hospitals about their use, including a number of patient incident reports. *Id.* ¶¶ 14, 15. Plaintiff has over 25 years of experience working with inhaled nitric oxide both in and outside of hospitals. *Id.* ¶ 13.

In October of 2021, Defendant was so impressed by Plaintiff's credentials that it created the position of Director of Clinical Services specifically for Plaintiff.*Id.* Plaintiff was provided an Offer Letter—which Beyond Air notably fails to include with its Motion to Dismiss—which provides:

> As discussed, your new position will be Director, Clinical Services, based out of our Garden City, NY office.
>
> Griebel Decl., ¶ 5, Ex. A.

Mr. Griebel's Employment Agreement also reflects that his employment with Beyond Air in New York. Specifically, it states that:

> 6.1 Governing Law; Venue. **This Agreement will in all respects be interpreted, governed, and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law. If a dispute arises out of or in connection with this Agreement or the subject matter of this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement, Employee agrees that a claim can be brought only in a federal or state court in New York.** Employee consents to the personal jurisdiction of such courts with respect to any claim arising out of or in connection with this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement.
>
> Declaration of John Morr dated December 22, 2025 [Dkt. 26] ("Morr Decl."), Ex. A (emphasis added).

Beyond Air also prepared and distributed Plaintiff's email signature block and business card, which both include Beyond Air's New York office address. Griebel Decl. ¶ 7, Ex. B.

As a non-executive level employee at Beyond Air, Plaintiff reported to senior management at Defendant. Amend. Cmplt. ¶ 14. And that same senior management directed where he would be on any given day, whether New York or elsewhere—and Plaintiff spend about 50% of his time traveling. Griebel Decl. ¶ 8. Due to his extensive experience and expertise, Defendant did not have to train Plaintiff when he started working for Defendant, and while at Beyond Air, Plaintiff was told he was exceeding expectations in every evaluation. Amend. Cmplt. ¶ 14.

### *B. Defendant Ignores Harm to Patients and Hospital Staff Caused by the LungFit PH Device*

During his employment at Beyond Air, Plaintiff participated in biweekly calls with the engineering team that also included the CEO, COO and VP of regulatory affairs, during which the team would routinely discuss problematical issues with the device. *Id.* ¶ 15. Yet, when Plaintiff expressed his concerns about the safety of the LungFit PH Devices, Defendant denied and rejected them, to the detriment of individuals relying on and operating the machines. *Id.*

While Plaintiff was employed by Defendant, the LungFit PH Device went through different versions of software and hardware, including the V20 Version, the V21 and 22 Versions. *Id.* ¶ 16. The V20 Version was prone to unpredictable failures, such as when a circuit board component would melt due to excessive heat, thus interrupting drug delivery, which could result in injury to patients (including the infants relying on the device). *Id.* Clinicians described the signs of circuit board failure as a loud pop followed by smoke emitting from the device's shell, and one clinician even stated the smoke caused a burning sensation in their eyes. *Id.* At least one quarter of the devices at Defendant's largest customer failed during use, including a device used on one patient who had received a heart transplant. *Id.* ¶ 17. For example, on February 27, 2024, an employee at that hospital texted Plaintiff letting him know that "we had a device that was replaced on the 16th to fail again. It was getting real loud then had a burning plastic smell. #6 serial#[*******]. We also have #8 [*******] that supposedly couldn't pass pre-use check." *Id.*

Practically everyone working at Defendant knew about this issue, including Beyond Air's Chief Executive Officer, Steve Lisi, and Chief Operating Officer (and it was documented in Defendant's document control system). *Id.* ¶ 18. After device failures on two separate patients (considered a "Sentinel Event"), the Respiratory Therapy Department Manager of one public hospital, at the direction of the hospital's risk management team, asked for an investigation to be

performed by Defendant on the device issue. *Id.* When Plaintiff brought this up to Defendant, he was ignored. *Id.*

Yet, Defendant continued releasing the V20 Version and failed to inform its other customers of the device failure. *Id.* ¶ 19. Defendant's Chief Operating Officer, Michael Gaul, instead tried to blame the device failures on how Beyond Air's biggest customer was using the devices, but clearly this was not the case after a different hospital experienced the same issue. *Id.* The LungFit PH Device subsequently failed on a patient there, leading the hospital to shut down the evaluation of the device and even send an email to Defendant about its safety concerns. *Id.* Upon information and belief, no documentation as to these failures was sent to the FDA, as Plaintiff never discussed filing any report with Beyond Air's Vice President of Regulatory Affairs, who would have been responsible for the same. *Id.* ¶ 20.

A serious issue with the V21 and V22 versions was a software issue where some of the units would randomly change a software setting which would make the nitric oxide sensor less sensitive, resulting in less reliable readings, that could substantially impact clinicians' decisions as to patient care. *Id.* ¶ 21. This was called "sensor drift." *Id.* Nitric oxide sensor drift was a problem with the original device version released for patient use, this was known as the V19 device. *Id.* ¶ 22. A V19 LungFit PH device was used on the very first patient and was on a low dose of nitric oxide when the nitric oxide sensor kept drifting to zero creating an alarm condition. *Id.* This patient was in the intensive care unit on a heart/lung assist device, a very ill and vulnerable patient. *Id.* The sensor drift occurred several times during the few hours the patient was on therapy—again no report to the FDA. *Id.*

Due to the issue (circuit board component melting) with the V20 Version of the LungFit PH Device, a V21 Version, which included a new circuit board, was finally developed. *Id.* ¶ 23.

But the same sensor drift issue continued in some of the V21 and V22 Versions, which would randomly change the software switch as mentioned above. *Id.* ¶ 23. In light of these failures, Defendant's engineering team started to test the device. *Id.* ¶ 24. Despite disconcerting reversions of the device making it prone to sensor drift that gave clinicians incorrect readings, Defendant instructed Plaintiff and other employees to continue using the device and not report any issue to the FDA or to customers using the devices or to doctors treating patients with the device. *Id.* ¶ 26.

As if all of these safety concerns were not enough, Plaintiff also was concerned about other design flaws with Defendant's devices, including: (1) that the alarm used to inform patients and clinicians that no nitric oxide was being generated, if the plasma chamber in the device fails, was not loud enough, and (2) the backup system for manual ventilation with a resuscitation bag occasionally failed to deliver nitric oxide, due to a technical issue that Defendant knew about. *Id.* ¶¶ 27-28.

Plaintiff notified Defendant on multiple occasions that the LungFit PH Device's alarm system was not loud enough. *Id.* ¶ 29. During an evaluation at one hospital, the respiratory therapy staff refused to put a patient on nitric oxide therapy because they would not be able to hear the alarm outside of the hospital ICU room. *Id.* While Defendant made improvements to the visual aspect of the alarm to make it more visible in the V20 Version, Defendant decided not to implement a change to increase the volume because it would cost too much and delay new device builds. *Id.*

***C. Defendant Continues to Act Recklessly to Try to Stay Competitive in its Industry***

In addition to failing to report or address serious hazards and potential harm of its devices, during Plaintiff's employment, Defendant made several other decisions regarding the LungFit PH Device and related products sold to hospitals that put patients and clinicians at risk, including:

- Effectively forcing hospitals to use nearly expired filters for their LungFit PH Devices and refusing to supply them with filters with a reasonable shelf life (which decision put at least one infant's life at risk). Plaintiff told Gaul, on multiple occasions, that Defendant should encourage hospitals to keep an emergency supply of filters. *Id.* ¶¶ 31-32
- Providing improperly validated accessories for the LungFit PH Devices that had not gone through the proper procedures required for FDA approval to hospitals, so that Defendant could quickly offer the same product claims as its competitors *Id.* ¶¶ 33-34. As a result, a newborn infant's therapy in one hospital was interrupted because a Breathing Kit was not properly assembled. *Id.* ¶¶ 33-35.
- Offering hospitals a device from another company, the AeroNOx Nitric Oxide Delivery System (the "AeroNOx System") from International Biomedical, with nitric oxide cylinders with inconsistent drug concentrations, because it did not have its own nitric oxide system to transport patients (the LungFit PH Device was not approved for use in ambulances, planes or helicopters). *Id.* ¶¶ 36-37. Plaintiff expressed his concern about the use of these cylinders on multiple occasions, but was rebuffed. *Id.* ¶ 37.
- Directing Plaintiff's team to set up LungFit PH Devices outside of Magnetic Resonance Imaging ("MRI") suites, because it was not approved for use in MRI suites, in a way that Plaintiff believed was dangerous to his team, clinicians using it, and patients. *Id.* ¶ 38.

***D. Independent Corroboration of the Ongoing Failures of Defendant's LungFit PH Device***

In June 2025, a major public university health system, the University of Texas Southwestern Medical Center ("UTSW") released documentation confirming, corroborating and validating the repeated failures of the LungFit PH Device that Plaintiff was observing and reporting. *Id.* ¶ 39. These dangerous incidents occurred throughout 2023 and 2024, including just

before the wrongful termination of Plaintiff's employment. *Id.* ¶ 40. The failures even continued into 2025 after Plaintiff's employment was wrongly terminated. *Id.*

By way of numerous examples, UTSW reported the following frightening and dangerous incidents, with failures in at least five (5) of its twenty-one (21) devices, leading to interruption of therapy and putting patients at risk (exact dates and some information is omitted from this pleading):

- August, 2023 — "strong burning noxious fumes detected," "fumes were strong enough to make therapists hold their breath."
- December, 2023 — "machine began to become warm to the touch and a smell similar to burning plastic could be smelled." This occurred on a post-operative organ transplant patient.
- February, 2024 - "The Lungfit machine (Nitric) Stopped working and stopped delivering nitric.. Machine stated main nitric failure. The machine was running real [loud] and smelled like burning plastic."
- February, 2024 [separate failure] - "LungFit PH device's motor became very loud in patient's room with a burning plastic smell around the device."
- April, 2024 — "RT was called to 920 by RN for LungFit making noise. Upon entering room a loud grinding noise was heard coming from the LungFit unit as well as a smell. The machine was switched off and back on to reset and appeared to be working. Then the screen went black and could not get the screen back on."
- November, 2024 — "During Code Blue [patient experiencing life-threatening situation] Lungfit #20 malfunctioned and stopped delivering Nitric to patient several times, after resetting machine several times."
- January, 2025 — "Lungfit gave an alarm 'Main device system failure' this morning twice while being in use on patient."

*Id.* ¶ 41.

### *E. Plaintiff is Terminated for Raising Concerns About Health Risks*

On multiple occasions during his employment, Plaintiff raised concerns as to his team's, patient, and clinician safety, based on the above hazards. *Id.* ¶ 42. Specifically, Plaintiff discussed these device failures with senior management at Defendant, including Defendant's Clinical Manager, its Vice President of Regulatory Affairs, its Chief Operating Officer, and its Chief Commercial Officer. *Id.* ¶ 43. Plaintiff's concerns were largely ignored or rejected. *Id.* For

example, when Plaintiff raised concerns about the safety of Defendant's unapproved device set up outside of MRI suites, the Chief Commercial Officer told Plaintiff that things are more lax in Europe so Defendant can use this set up there, and asked Plaintiff to create a PowerPoint presentation showing how to set up the unsafe device. *Id.* ¶ 44.

Finally, in December of 2024, Defendant grew tired of Plaintiff's concerns and wrongfully terminated him after he suggested a better process for addressing device failures at hospitals, after numerous failures had occurred, and in response to the CEO Steve Lisi's suggestion to basically ignore them. *Id.* ¶¶ 45-51. Plaintiff's team had to replace broken LungFit PH Devices on a December 2024 weekend in response to a request from the hospital where they were being used. *Id.* ¶ 46. Notably, all nitric oxide delivery systems contain a warning *not to* abruptly discontinue nitric oxide delivery as it can result in harm to the patient, including death. *Id.*

After Plaintiff's team did so, Defendant's Chief Executive Officer, Steve Lisi, wrote an email to Defendant's fields teams, including Plaintiff's team, admonishing Plaintiff's team for replacing two LungFit PH Devices on a weekend after an alarm went off, because it "costs us a lot of money and is COMPLETELY UNECESSARY." *Id.* ¶ 47; Morr Decl., Ex. D. He further instructed the team that in the future they should tell the hospital to keep the system and provide a replacement in 2-3 business days. Amend. Cmplt. ¶ 47; Morr Decl., Ex. D. Thus, Defendant's CEO discouraged Plaintiff's team from replacing a hazardous failing machine that was responsible for providing patient care on a weekend, because in the mind of Beyond Air's CEO it was too expensive. Amend. Cmplt. ¶ 47

Plaintiff knew that the LungFit PH Device is used in critical care, that when it fails it can result in a life-threatening event, and that despite Mr. Lisi's assertions to the contrary, quick replacement of this particular device was necessary. *Id.* ¶ 48. Thus, on the same day, Plaintiff

responded, explaining that only one device was replaced for routine maintenance. *Id.*; Morr Decl., Ex. D. The second device was replaced because it had failed on a patient and the hospital was requesting an investigation of the device for their risk management. Amend. Cmplt. ¶ 48; Morr Decl., Ex. D. Plaintiff further offered to discuss the procedure for non-urgent replacement times and "come up with some reasonable guidelines" for customers and hospitals, including hospitals operated by, affiliated with or regulated by state or local departments of an executive branch of government. Amend. Cmplt. ¶ 48; Morr Decl., Ex. D.

Yet, despite this reasonable and productive response, just one day later on December 17, 2024, Plaintiff received an unscheduled call from Defendant's head of Human Relations, informing him that he was terminated. Amend. Cmplt. ¶ 49. Because of Plaintiff's experience and expertise in the industry, Plaintiff's co-workers were shocked. *Id.* Plaintiff's termination, just one day after his response to Mr. Lisi's uneducated and unsafe demands that urgent device replacement never take place on a weekend, was plainly retaliation for his raising concerns about Defendant's unlawful practices. *Id.* ¶ 50. As if wrongfully terminating Plaintiff were not enough, Defendant also provided him with a severance letter, offering only 25 days of his salary on the condition that he not work for any "Established Competitor" (Defendant provided a comprehensive list) anywhere in the United States. *Id.* ¶ 51. Plaintiff did not sign the severance letter. *Id.*

Because Plaintiff was completely blindsided by Beyond Air's termination of his employment, and he needed to secure some financial stability as quickly as possible, Plaintiff, who had never experienced a termination before, applied for unemployment benefits in the state where he resides, Colorado, in January 2025. Griebel Decl. ¶ 9.

### *F. This Action*

Plaintiff initiated this action on May 28, 2025 with the filing of the Complaint, asserting two whistleblower claims against Beyond Air pursuant to sections 740 and 741 of the New York Labor Law ("NYLL"). Dkt. 1. On June 16, 2025, Plaintiff filed the Amended Complaint, Dkt. 7, asserting the same two claims, and adding allegations concerning reports by a hospital where multiple dangerous incidents occurred because of malfunctioning of Beyond Air's devices. *Id.* at ¶¶ 39-41. Beyond Air submitted a pre-Motion letter—that relied substantially on the same authorities and arguments set forth in this Motion—on July 25, 2025, Dkt. 12, which Plaintiff opposed, Dkt. 14. The Court held a pre-Motion conference with the parties on October 29, 2025, and a Beyond Air filed this Motion on December 22, 2025. Dkt. 24-28. For the reasons set forth herein, the Motion should be denied.

## ARGUMENT

### I. STANDARD OF REVIEW

First, none of the standards that apply on a motion pursuant to Fed. R. Civ. P. ("FRCP") 12(b)(1) for lack of subject matter jurisdiction apply here (nor does Defendant even attempt to set them out in its papers). Defendant's Motion is based on its assertion that Plaintiff cannot bring this action pursuant to New York's labor law, not that this Court cannot hear Plaintiff's claims, so even if Plaintiff were to prevail on its Motion, the result would be the application of Colorado law in this diversity action. There is no issue of subject matter jurisdiction to be determined on this Motion (and Defendant certainly cannot claim that a different forum is appropriate given its own forum selection clause in Plaintiff's Employment Agreement).

Defendant also moves pursuant to FRCP 12(b)(6). "To survive a motion to dismiss [pursuant to FRCP 12(b)(6)] a complaint must contain sufficient factual matter ... to state a claim

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). In determining plausibility, the Court "should construe the complaint 'liberally, accepting all factual allegations ... as true, and drawing all reasonable inferences in the plaintiff's favor.'" *Saget v. Trump*, 345 F.Supp.3d 287, 293 (E.D.N.Y. 2018) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "So long as a claim is 'plausible on its face,' dismissal is inappropriate." *Id.* (quoting *Sharkey v. Quarantillo*, 541 F.3d 75, 92 (2d Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Defendant incorrectly asserts that this Court may consider the statements in John Morr's declaration on its Motion to dismiss pursuant to FRCP 12(b)(6). While "[c]onsideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion . . . before materials outside the record may become the basis for a dismissal, several conditions must be met." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). "For example, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

The conclusory statements about Plaintiff's employment in John Morr's affidavit cannot properly be considered on a motion to dismiss and certainly not as to the substantive allegations of whistleblowing in Plaintiff's complaint. The Second Circuit explained that "it would have been error for the district court to have dismissed the amended complaint on the basis of [declarations

concerning the merits of the action], rather than on the basis of the amended complaint." *Id.* Morr baldly asserts that "Plaintiff was terminated in December 2024, as part of an overall effort by Beyond Air to downsize its workforce by 50% . . ." Morr Decl. ¶ 9.[1] Such a conclusory statement, outside the pleadings, without anything to support Morr's personal knowledge of the same, and before discovery, cannot be used to defeat the allegations in an Amended Complaint on a motion to dismiss. This is particularly true here as Defendant has refused to participate in discovery in this matter failing to serve any requests on Plaintiff by December 15, 2025, Haddad Decl. ¶ 4, the deadline set forth by Judge Tiscione, and failing to respond to Plaintiff's document requests, and interrogatories timely served on December 15, 2025, thereby taking for itself its own discovery stay despite this Court's express denial of Defendant's request for a discovery stay [Dkt. 23]).

Defendant's half-hearted request to convert this Motion to one for summary judgment should also be denied, because Defendant has not complied with the requirements of this Court's Individual Rules, B.i., or the Local Rules of the United States District Court for the Eastern District of New York, which require a "statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." 56.1(a) ("Failure to submit such a statement may constitute grounds for denial of the motion.") Nevertheless, as set forth below, even considering Morr's affidavit, and all of the documents Defendant has submitted on this Motion, Defendant still has failed to demonstrate any basis for dismissal.

---

[1] Even if this Court were to consider Morr's bald assertion on this Motion, it could not support dismissal because it at most goes towards Beyond Air's assertion of a factual defense under Sections 740 and 741 of the NYLL. § 740(4)(c) ("It shall be a defense to any action brought pursuant to this section that the retaliatory action was predicated upon grounds other than the employee's exercise of any rights protected by this section."); § 741(5) ("In any court action brought pursuant to this section it shall be a defense that the personnel action was predicated upon grounds other than the employee's exercise of any rights protected by this section.") And Morr's declaration only further proves the impetus for Beyond Air to ignore patient safety and FDA protocols: to cut costs.

## II. PLAINTIFF HAS STATED A CLAIM PURSUANT TO §§ 740 AND 741 of THE NYLL

### A. The New York Labor Law Applies to Plaintiff's Claims

Beyond Air's own documentary evidence, as well as Plaintiff's Offer Letter, which Beyond Air notably fails to include with its Motion, demonstrate that Plaintiff was employed in New York. Beyond Air's Offer Letter expressly provides:

> As discussed, your new position will be Director, Clinical Services, **based out of our Garden City, NY office.**

Griebel Decl., Ex. A at 1 (emphasis added).

Moreover, Plaintiff's Employment Agreement (Morr Decl., Ex. A), prepared by Beyond Air, provides:

> 6.1 Governing Law; Venue. **This Agreement will in all respects be interpreted, governed, and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law. If a dispute arises out of or in connection with this Agreement or the subject matter of this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement, Employee agrees that a claim can be brought only in a federal or state court in New York.** Employee consents to the personal jurisdiction of such courts with respect to any claim arising out of or in connection with this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement. (emphasis added)

In addition to expressly telling Plaintiff that he was employed in New York and his employment was governed by New York law in these written documents, Beyond Air also provided Mr. Griebel with an email signature block and business card both including the New York office address exclusively. Griebel Decl., Ex. B. And as demonstrated by the position description that Defendant itself includes with its Motion, Morr Decl., Ex. B, Plaintiff's position was "field" based, meaning his responsibilities at Beyond Air stretched across the entire United States, requiring his "[a]bility to travel up to 80% as needed." *Id.* at 3; Griebel Decl. ¶ 8 (explaining that as field-based employees in his industry do, he was actually traveling approximately 50% of

the time at Defendant's direction). And as Defendant concedes, Plaintiff on multiple occasions was approved for, and required to, travel to New York. Morr Decl. ¶ 5, Exs. C, D. Thus, despite the fact that Plaintiff's claims arise from a job that Defendant told him in writing was based in New York and subject to New York law, and Defendant's own admission on this Motion that Plaintiff's job required frequent travel and oversight across the entire country, Defendant still argues that Plaintiff is required to bring suit under Colorado law merely because his home address is in Colorado.[2]

Despite asserting that Plaintiff's Agreement is so "*Integral to the Complaint*" that it may be considered on this Motion, Motion at 6, Defendant simultaneously argues that the governing law provision of the same agreement is not applicable at all to Plaintiff's claims. This argument is unavailing though in light of the language of the Employment Agreement, which provides not only that it shall be "interpreted" by the laws of New York, but also "governed" by them and "enforced" by them, *and* that disputes "aris[ing] out of or in connection with this Agreement or the subject matter of this Agreement . . . can be brought only in a federal or state court in New York." None of the cases Beyond Air cites address contracts with such broad language. Defendant ignores this contractual clause, and would have this Court do the same.

The very purpose of the whistleblower act is to encourage whistleblowing against New York businesses. In this regard the truncated quotation from the legislative history referenced by Defendant at pages 8-9 of its brief wholly misses the mark. While Defendant tries to suggest that

---

[2] Notably, while Defendant places significant weight on Plaintiff's residence in Colorado (and incorrectly asserts without any support that Plaintiff's "situs of employment was always in Colorado" Motion at 2), even the cases Defendant relies on which are not applicable here, rejected that same argument. *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013) ("Plaintiff's reliance on residence or domicile is misplaced. The crucial issue is where the employee is laboring, not where he or she is domiciled.") (internal quotation marks omitted).

the whistleblower act is limiting, the very next paragraphs omitted from Defendants' quote show the opposite to be true. *See* 2019 New York Assembly Bill No. 375 ("Whistleblower claims are particularly important because, by exposing problems in government and society, the need for reform is identified. Discouraging legitimate whistleblower claims is a barrier to remedying corruption.")

Moreover, even if Plaintiff's Employment Agreement did not set forth the governing law here, contrary to Beyond Air's suggestion, "New York courts have declined to adopt a brightline rule barring the extraterritorial application of the NYLL and instead apply New York choice of law rules to determine whether the NYLL should apply." *Hobbs v. Knight-Swift Transportation Holdings, Inc.*, 2025 WL 1577271, at *16 (S.D.N.Y. June 4, 2025). Thus, "[w]here [as here] the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws" and "[i]n assessing the locus of the tort for purposes of the NYLL, the court treats the location of [Plaintiff's] employment to be the relevant locus here, since the object of the statutory claims is the employment relationship . . ." *Id.* (internal quotation marks omitted). As the above demonstrates, Plaintiff was employed in New York and therefore, his claims are governed by the NYLL.

Beyond Air, ignoring the above law, again cites the cases it cited in its pre-Motion letter, which do not apply because not one of them analyzed claims of whistleblower retaliation under the NYLL. Specifically, several of the cases Defendant cites concern wage and other payment claims under Article 19 of the NYLL, not NYLL Article 20-C which applies here. Importantly, Article 19 (the wage article) "begins with a 'Statement of Public Policy' section stating that it was enacted to address the fact that '[t]here are persons employed in some occupations *in the state of New York* at wages insufficient to provide adequate maintenance for themselves and their

families.'" *See In re Stage Presence, Inc.,*559 B.R. 93, 100 (Bankr. S.D.N.Y. 2016), aff'd sub nom *In re Stage Presence, Inc.,* 2019 WL 2004030 (S.D.N.Y. May 7, 2019) (italics in original); *Magnuson v. Newman,* 2013 WL 5380387, at *5 (S.D.N.Y. Sept. 25, 2013) (analyzing a claim under the same article and citing the same public policy provision).[3]

Beyond Air also cites cases which are limited to other wage and overtime provisions of the NYLL, which similarly have very different concerns from the whistleblower provisions. *Hammell v. Paribas*, 1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993) ("New York Labor Law § 198(1–a) . . . appears in an article of the labor law clearly aimed at regulating the conduct of actors within the state's boundaries. The purpose of this area of the labor law is clearly to protect workers laboring in New York."); *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013) (also analyzing Section 198 and quoting this portion of *Hammell*); *see also Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*, 2006 WL 2356157, at *7 (S.D.N.Y. Aug. 9, 2006) (analyzing plaintiff's equal pay claims).

Citing *O'Neill* and *Hammell*, the Court in *Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*, another case that Defendant relies on, declined to grant summary judgment to defendant on plaintiff's minimum wage claims concerning out-of-state work, where it found that "[n]one of these cases addresses the question here: does the NYLL embrace work done by a New York-based employee of a New York company who begins and ends his workday in New York but spends a substantial part of his workday transporting goods to out-of-state buyers?" 2015 WL 5567073, at *9 (E.D.N.Y. Sept. 21, 2015) ("The cases defendants cite to support their theory are not on point.

[3] Two of the cases Defendant cites do not even concern labor law. *Goshen v. Mut. Life Ins. Co. of New York*, 286 A.D.2d 229, 229 (1st Dept 2001), aff'd, 98 N.Y.2d 314 (2002) (analyzing class action claim under General Business Law § 349(h)); *Manfredonia v. Am. Airlines, Inc.*, 68 A.D.2d 131, 132 (2d Dept 1979) (analyzing claim under General Obligations Law, Section 11-101).

Those cases stand only for the uncontroversial proposition that a state's labor laws do not reach work done entirely and exclusively outside that state.")

Defendant also again relies on cases that only involved claims under the Human Rights law,[4] not NYLL Article 20-C. *Hoffman* v. *Parade Publications,* 15 N.Y.3d 285, 291 (2010) (emphasizing that "[t]he Legislature enacted [the State's Human Rights Law] through its invocation of 'the police power of [New York State] for the protection of the public welfare, health and peace *of the people of this state*.'") (quoting Executive Law § 290[2]) (emphasis by court); *Meilus v. Rest. Opportunities Ctr. United, Inc.*, 2021 WL 4868557, at *9 (S.D.N.Y. Oct. 15, 2021) (same); *Murray v. Brag Sales Inc.*, 2024 WL 4635479, at *2 (S.D.N.Y. Oct. 31, 2024) (citing *Hoffman* and affirming on reconsideration denial of NYCHRL claim based on "the bare fact that [the Plaintiff] lived in New York City during the time period of his employment."); *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 42 (2d Cir. 2012) (applying *Hoffman* in analyzing NYCHRL claims).

Finally, even the Report and Recommendation that Defendant cites which did concern retaliation claims under the NYLL, did not concern an employee who, like Plaintiff, had his employment "based in" New York, while being responsible for patient care across the country. *Smith v. Vera Inst. of Just., Inc.*, 2023 WL 11879682, at *16 (E.D.N.Y. Aug. 11, 2023) (recommending dismissal of retaliation claim where the plaintiff "only alleges one specific work trip to New York in 2020" not during the time of the alleged retaliation). Moreover, the record in *Smith* did not reflect that the parties had an employment agreement which (like the one here) states the employee was "based out of" the Company's New York office. And, the actual wrongdoing—

[4] As the Court noted during the pre-motion conference, "[t]he human rights law is something that's quite different, really . . . the purposes of it and the limits to the effects in New York City, if it's a New York City Human Rights Law or the state human rights law." Haddad Decl., Ex. A at 4:1-4.

the termination of Plaintiff's employment a week before Christmas—was orchestrated from and occurred in New York. Amend. Cmplt. ¶¶ 10, 49-50.[5]

Here, Defendant itself told Plaintiff he was employed in New York and contrary to Beyond Air's assertions, his domicile in Colorado is not a relevant consideration, particularly for a remote job that required oversight across the country. Defendant has not cited any on point case which requires a different result here. Therefore, Defendant's Motion should be denied.

### B. Section 741 of the NYLL Applies to Plaintiff's Claims

Plaintiff has adequately alleged a claim pursuant to Section 741 of the NYLL, because Defendant, through Plaintiff, provides "health care services." NYLL § 741(1)(a). Plaintiff, has "over 25 years" of "experience with inhaled nitric oxide . . . both in and outside of hospitals," Amend. Complt. ¶ 13, "was responsible for overseeing the use of the LungFit PH Devices . . ." in hospitals, *id.* ¶ 14, and dealt with "patient incident reports concerning the LungFit PH Devices . . ." *Id.* ¶ 15. Thus, Plaintiff was responsible for making knowledgeable judgments as to the quality of patient care. And the violations of Section 741, which Plaintiff alleges in the Amended Complaint, and reported to Beyond Air, concern its disregard for the safety of patients, which is precisely what Section 741, and specifically Section 741(1)(d) defining "improper quality of patient care" was enacted to prevent. *See* New York Bill Jacket, 2002 A.B. 9454, Ch. 24 ("Since

[5] Defendant also cites *Garcia v. ROC Nation LLC*, 2025 WL 1865965, at *17 (S.D.N.Y. July 2, 2025). The Court in that case declined to dismiss a complaint filed by a Texas resident under the NYLL explaining "[t]he potential choice-of-law question in determining whether Plaintiff may invoke the NYLL's retaliation protection is fact-intensive and premature to resolve at the motion to dismiss stage." 2025 WL 1865965, at *17 (S.D.N.Y. July 2, 2025) (internal quotation marks omitted). Defendant nevertheless suggests that because Plaintiff here spent less days in New York than the Plaintiff in that case alleged, the same standard does not apply. That is not a correct interpretation of *Garcia's* holding, and even if it were, Defendant cannot ignore all of the other facts, including its own contracts, which demonstrate that Plaintiff was employed in New York. *Id.* ("Defendants cannot at this stage defeat Plaintiff's NYLL retaliation claim by arguing that the conduct occurred outside 'New York state's geographical boundaries.'")

healthcare employees are in the best position to witness instances of substandard care, they should be encouraged to report such instances when they feel they have no other recourse. This bill, by providing employee protection against retaliation, provides such encouragement.")

While it is not necessary to look outside the Amended Complaint, Beyond Air's own job posting for Plaintiff's position further demonstrates his provision of "health care services." Specifically, he was responsible for "communicat[ing] the needs of patients and customers to clinical, engineering and commercial teams," which communications Defendant consistently ignored, *see generally*, Amend. Cmplt. and he was required to have "10+ years of progressive development and critical care hospital experience in respiratory care as well in a medical device or life sciences technology-driven company." Morr Decl., Ex. B at 1, 3. And Plaintiff did in fact have over 25 years of experience both in and outside of hospitals. Amend. Cmplt. ¶ 13.

Plaintiff's experience and job function is readily distinguishable from that of the employees in the cases Defendant cites. First, in *Reddington v. Staten Island Univ. Hosp.*, the Court, in *dicta* in a footnote, noted that "[e]ven aside from plaintiff having waived her claim under § 741, she fails to state a claim under that section" because "she acted as an interpreter and [] she held the positions of Coordinator and Manager of Volunteer Services and later Director of the [International Patient Program]" and had no medical training. 373 F. Supp. 2d 177, 187 n.7 (E.D.N.Y. 2005). In contrast, here, Plaintiff was responsible for monitoring the use of LungFit PH Devices and assessing incidents as to particular patients.

In the other case that Defendant cites, *Moynihan v. New York City Health & Hosps. Corp.*, the Plaintiff "had no responsibility, direct or indirect, for providing treatment or care to any patient, for any patient outcome, or even for facilitating the provision of care or treatment to patients through the allocation of [Defendant's] resources. She was charged simply with making sure that

[Defendant] did not run afoul of applicable legal requirements in the documentation of human-subject research projects conducted at its hospitals." 120 A.D.3d 1029, 1032–34 (1st Dept 2014) ("To reiterate, [Plaintiff] did not provide care; she did not supervise those who provided care; and she did not facilitate the provision of care through resource allocation. She reviewed paperwork for compliance with legal requirements . . .") Thus, whereas the Plaintiff in *Moynihan* had no *direct or indirect* responsibility for patient care, here, Plaintiff was responsible for making decisions about the use and replacement of Beyond Air's devices as to patients across the country.

### C. Plaintiff has More than Adequately Alleged Whistleblowing Activity for Which Beyond Air Terminated his Employment

Defendant incorrectly asserts that Plaintiff's has not alleged he engaged in any protected activity under Sections 740 and 741. "For pleading purposes [under NYLL Section 740], the complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct." *Arazi v. Cohen Bros. Realty Corp.*, 2022 WL 912940, at *11 (S.D.N.Y. Mar. 28, 2022) (internal quotation marks omitted); *see also Von Maack v. Wyckoff Heights Med. Ctr.*, 140 A.D.3d 1055, 1057 (2d Dept 2016) (explaining the same pleading standard applies to Section 741). As set forth above, Plaintiff has satisfied this standard by alleging numerous dangerous acts by Beyond Air, which Plaintiff expressed concerns about, that consistently put the safety of patients across the country at risk, including its CEO's suggestion that weekend requests by hospitals for replacement of devices should simply be ignored.

Defendant incorrectly asserts that Plaintiff's response to Defendant's CEO's December 16 email neither "opposed Mr. Lisi's assessment of the unnecessary expense" or asserted "that Beyond Air's policies to avoid such an unnecessary expense was either a statutory or regulatory

violation." Motion at 18. Defendant's mis-characterization of this email, through its Head of Human Resources, who was not even copied on the email, certainly cannot be sufficient to support dismissal at this stage, and in any event, is incorrect. It is certainly not "routine business," Morr Decl. ¶ 8, to have to replace multiple machines because of failures, which were for years known to Beyond Air management, as alleged in the Amended Complaint. Nor was the hospital's request for an investigation "routine."

As Plaintiff alleged, Mr. Lisi "admonish[ed] Plaintiff's team for replacing two LungFit PH Devices on a weekend after an alarm went off," because it "'costs us a lot of money and is COMPLETELY UNECESSARY.'" Amend. Cmplt. ¶ 47. Plaintiff's response—that only one device was replaced for routine maintenance, the second device was replaced because it had failed on a patient and the hospital was requesting an investigation of the device for their risk management, and that he could discuss additional guidelines for non-urgent requests to provide hospital customers and employees going forward —plainly indicated to Mr. Lisi that his proposal to simply not replace the device posed a threat to patient safety that Plaintiff would not comply with. And this was after Plaintiff had made numerous other complaints to senior management about what he believed were unlawful and unsafe practices by Defendant. If, as Mr. Morr suggests in his Declaration, "[t]his is nothing more than a routine business discussion about costs and procedures," Morr Decl. ¶ 8, then why did Plaintiff receive no response from Mr. Lisi and his notice of termination the very next day?

Defendant's decision to terminate Plaintiff the day after he refused to engage in an unsafe practice proposed by Defendant's CEO, stands in combination with the numerous other complaints Plaintiff made (and alleged) about Beyond Air's "multiple hazardous and unlawful decisions" that "put at risk the health of patients and clinicians in multiple hospitals . . ." Amend. Complt. ¶ 4.

These decisions occurred "throughout 2023 and 2024, including just before the wrongful termination of plaintiff's employment." *Id.* ¶ 40. And Plaintiff "raised concerns as to his team's, patient, and clinician safety" to "senior management at Defendant, including Defendant's Clinical Manager, its Vice President of Regulatory Affairs, its Chief Operating Officer, and its Chief Commercial Officer" on "multiple occasions during his employment" *id.* ¶¶ 42-43, specifically:

- Plaintiff raised that one public hospital had asked for an investigation to be performed, and was ignored *id.* ¶ 18;
- Plaintiff notified Defendant on multiple occasions that the LungFit PH Device's alarm system was not loud enough *id.* ¶ 29;
- Plaintiff advised Gaul on multiple occasions that Defendant should encourage hospitals to keep an emergency supply of filters for the device *id.* ¶ 32;
- Plaintiff expressed his concern about the use of improper nitric oxide cylinders in transport systems but was rebuffed *id.* ¶ 37;
- Defendant directed Plaintiff's clinical team to instruct hospitals on how to set up the LungFit PH Device outside MRI suites, in a way that Plaintiff believed was dangerous to his team, clinicians using it, and patients *id.* ¶ 38 and when Plaintiff raised concerns, the CCO told him things are more lax in Europe so Defendant can use this set up there and asked Plaintiff to create a PowerPoint presentation on how to set up the unsafe device. *Id.* ¶ 44.

Thus, Plaintiff has more than sufficiently alleged that his termination was due to Beyond Air's frustration with his complaints about the company's dangerous "business" decisions and his desire to do something about them.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion to dismiss the Amended Complaint. Plaintiff respectfully requests that in the event this Court grants the Motion, Plaintiff be given leave to amend the complaint pursuant to FRCP 15(a)(2).[6]

[6] Defendant's request, in its counsel's Declaration filed with the Motion, for "costs, disbursements and reasonable attorney's fees" Dkt. 25 ¶ 5 should also be denied. Defendant asserts absolutely no basis for an award of attorneys' fees and costs to it—not a statute, not a contract, not a case.

Dated: January 26, 2026

Respectfully submitted,

**OTTERBOURG P.C.**

By: /s/ *Richard G. Haddad*

Richard G. Haddad
rhaddad@otterbourg.com
Alessandra M. Dagirmanjian
adagirmanjian@otterbourg.com
230 Park Avenue
New York, New York 10169
Tel: (212) 905-3672
Fax: (212) 682-6104
*Counsel for Plaintiff Jeffrey Griebel*