UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
**JEFFREY GRIEBEL**,                                               :
                                                                   :
                                    Plaintiff,                     :
                                                                   :    **MEMORANDUM DECISION AND**
                      – against –                                  :    **ORDER**
                                                                   :
**BEYOND AIR, INC.**,                                              :    25-CV-2969 (AMD) (ST)
                                                                   :
                                    Defendant.                     :
                                                                   :
------------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this action against the defendant, his former employer, under New York Labor Law ("NYLL") Sections 740 and 741. The plaintiff claims that the defendant fired him to retaliate against him for raising concerns about defects in medical devices the defendant manufactured. (ECF Nos. 1, 7.) Before the Court is the defendant's motion to dismiss the first amended complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 24.) For the reasons explained below, the motion is granted in part and denied in part.

## BACKGROUND[1]

### I.     Factual Background

#### a.     The Plaintiff's Employment

The defendant is a medical device and biopharmaceutical company that manufactures LungFit PH devices, which generate nitric oxide for hospital patients. (ECF No. 7 ¶ 2.) The

---

[1] The facts are drawn from the complaint and, as explained below, defense exhibits that are incorporated by reference or otherwise integral to the complaint.

United States Food and Drug Administration ("FDA") has approved the device for hospitals to treat critically ill patients, including newborn infants with pulmonary hypertension. (*Id.*) The defendant is a Delaware company with headquarters in Garden City, New York. (*Id.* ¶ 10.)

In the fall of 2021, the defendant hired the plaintiff to be the director of clinical services. (*Id.* ¶ 13.)[2,3] This was a new position; the plaintiff's responsibilities included overseeing the use of the LungFit devices in hospitals and communicating with hospital customers. (*Id.* ¶¶ 13–14; *see also* ECF No. 26-2 (Job Description).)[4] The defendant's contingent job offer, which it emailed the plaintiff on October 26, 2021, said that the job was "based out of our Garden City, NY office." (ECF No. 29-1 at 2.) A few days later, the defendant emailed the plaintiff an "At-Will Employment and Confidentiality Agreement," which "set[] forth the terms and conditions of [the plaintiff's] employment with the Company;" the cover page of the email says the "Employee Office" is "Garden City, NY." (ECF No. 26 ¶ 4; ECF No. 26-1 at 1.) The agreement includes a provision titled "Governing Law; Remedies," with New York choice of law and forum selection provisions:

---

[2] The plaintiff, who has over twenty-five years of experience in the inhaled nitric oxide treatment field, applied to be a project coordinator. (ECF No. 7 ¶ 13.)

[3] The plaintiff says that the defendant hired him in October 2021 (ECF No. 7 ¶ 13), while the defendant says that it employed the plaintiff from December 13, 2021 until December 31, 2024 (ECF No. 26 ¶ 4).

[4] As discussed further below, the defendant submitted with its motion to dismiss a declaration by its Head of Human Resources, the plaintiff's employment records, a job description for the plaintiff's role, travel expense records, and an email exchange between the plaintiff and the defendant's CEO. (*See* ECF Nos. 26, 26-1–26-5.) The defendant also filed a summary of the plaintiff's unemployment insurance benefits from Colorado. (ECF Nos. 28, 28-1.)

> This Agreement will in all respects be interpreted, governed, and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law. If a dispute arises out of or in connection with this Agreement or the subject matter of this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement, Employee agrees that a claim can be brought only in a federal or state court in New York. Employee consents to the personal jurisdiction of such courts with respect to any claim arising out of or in connection with this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement.

(ECF No. 26-1 at 6.)[5] The defendant also used the company's New York office address for the plaintiff's email signature block and business cards. (ECF No. 29 ¶ 7; ECF No. 29-2 at 2–3.) The plaintiff lived in Colorado while he worked for the defendant, which was headquartered in New York. (ECF No. 7 ¶¶ 9–10.)

The defendant also submitted a description of the plaintiff's job. (ECF No. 26-2.) It provides that "[t]he primary role of the Director Clinical Services is to direct the clinical specialist team in support of commercial operations and medical affairs enquiries." (*Id.* at 1.) The Director "works closely with senior management including clinical affairs, engineering, research and development and the commercial field teams and directors to ensure that customers are appropriately trained to assure patient safety and customer enquiries are dealt with and that current and future products are optimized for patients and customers." (*Id.*) The Director "also maintains awareness of the clinical developments in the field, new and emerging therapies, competitive intelligence and reports pertinent information to senior management." (*Id.*) The job description also included the qualifications the defendant was seeking in applicants for the position, including "15+ years of progressive development and critical care hospital experience

---

[5] The agreement also provides the plaintiff was "an at-will employee," and that "either Employee or Company may terminate Employee's employment at any time, for any reason or for no reason, with or without notice." (ECF No. 26-1 at 2.)

in respiratory care as well [as] in a medical device or life sciences technology-driven company," "[b]edside clinical experience in treating patients with respiratory needs in hospital Intensive Care Unit settings," and "[d]irect experience with Nitric Oxide therapy." (*Id.* at 3.) The position was full-time and "[r]emote," with the "[a]bility to travel up to 80% as needed." (*Id.* at 1, 3.)

>    **b.**   **The Plaintiff's Whistleblower Allegations**

As the director of clinical services, the plaintiff reviewed patient incident reports about the LungFit devices. (ECF No. 7 ¶ 15.) He alleges that he knew of and reported to the defendant's senior management multiple incidents at different hospitals in which the defendants made dangerous decisions that put patients, clinicians, and the plaintiff's own team at risk:

- Supplying LungFit devices to hospitals even after learning that a circuit board component overheated and melted, putting patients and clinicians at risk, without informing all customers or reporting the issue promptly to the FDA;

- Supplying clinicians with new versions of the LungFit, even after a software malfunction caused the devices to give inaccurate nitric oxide sensor readings, without informing customers or reporting the issue to the FDA;

- Making hospitals rely on nearly expired filters by refusing to supply filters with "reasonable" shelf lives; and

- Providing improperly validated accessories for the LungFit devices that had not gone through the proper procedures for FDA approval.

(*Id.* ¶ 4.) The plaintiff contends that at least a quarter of the devices at the defendant's largest customer failed during use, including during treatment of a heart transplant patient. (*Id.* ¶ 17.) The University of Texas Southwestern Medical Center documented repeated failures of the LungFit device throughout 2023 and 2024. (*Id.* ¶¶ 39–41.)

The plaintiff routinely discussed the problems with the devices during biweekly calls with the CEO, COO, Vice President of Regulatory Affairs, and the engineering team. (*Id.* ¶ 15.) The plaintiff alleges that "[p]ractically everyone," "including [the] Chief Executive Officer ('CEO') and Chief Operating Officer ('COO')," knew about a software issue that caused the circuit board component to overheat and melt, resulting in a "loud pop followed by smoke [] from the device's shell." (*Id.* ¶¶15–16, 18, 42–44.) The problem "was documented in [the defendant]'s document control system," but the defendant ignored or rejected the plaintiff's concerns. (*Id.* ¶¶15–16, 18, 42–44.) The plaintiff further alleges that the defendant relied on defective software, blocked investigations of device failures, and did not warn hospitals of the failures, report the issues to the FDA, or discuss reporting the failures to the FDA with the defendant's Vice President of Regulatory Affairs, who would have been responsible for doing so. (*Id.* ¶¶ 18–26.)

### c. The Plaintiff's Termination

The plaintiff alleges that the defendant "grew tired" of his concerns about the LungFit devices, and, in December 2024, "wrongfully terminated him after he suggested a better process for addressing device failures at hospitals." (*Id.* ¶ 45.) On or about Sunday, December 15, 2024, the plaintiff's team replaced a LungFit device, at a hospital customer's request, because the device failed during a patient's treatment. (*Id.* ¶¶ 46, 48; ECF No. 26-5 at 1.) The hospital asked for an investigation, and the plaintiff believed that "quick replacement of this particular device was necessary." (ECF No. 7 ¶ 48; ECF No. 26-5 at 1–2.) The next day, in an email to the company's field teams, including the plaintiff's team, the defendant's CEO "admonish[ed]" the plaintiff's team "for replacing two LungFit PH Devices on a weekend after an alarm went off, because it 'costs us a lot of money and is COMPLETELY UNECESSARY.'" (ECF No. 7 ¶ 47.)

The defendant submitted what it represents is the complete email from the CEO, which reads in part:

> I heard that UTSW had 2 systems hit 800 hours on Sat. The request to have Sunday delivery came in and we did it. This costs us a lot of money and is COMPLETELY UNECESSARY.
>
> When the alarm goes off at 800 hours, it is a warning. The system is good for another 200 hours or 8 DAYS OF CONTINUOUS USE. Hence if a hospital has this situation, you tell them to keep the system and we will have a replacement in a normal timeframe (2-3 business days).
>
> If this is not clear, then sign up for training which will be Sundays at 8am EST (Israel is awake so I'm awake).

(ECF No. 26-5 at 2.) The plaintiff replied:

> I went back through the history of UTSW CFI's this weekend as I wanted to get the complete story. The request ended up being one device for Maintenance Due (which doesn't make it any better), but the original request had the wrong SN, so another email was sent to update (which is why it looked like two devices). There was a second device (569) that went into Main Delivery Failure on a patient, the hospital is asking for feedback on the device issue as they must do their own investigation (it looks like a compressor or internal leak). Both devices were requested as a "non-urgent" swap by the CS. We have been operating under the following guidelines: When a CFI [] is submitted, it is designated as Urgent or Non-Urgent based on what customer information is supplied. Urgent is considered within 6 hours (or as close as possible) or Non-Urgent (within 24 hours) unless otherwise specified. The hospital was offered Monday and requested Sunday as they stated they had a lot of machines running. We can readdress the non-urgent request time frame (especially regarding the weekend). I can talk to Derek and Rob about inquiring about the number of devices available at the hospital prior to agreeing to moving a device on a weekend, we can come up with some reasonable guidelines. I will also talk to the CS team about the weekend situation when we get these calls. We do instruct hospitals that they have at least 8 days of therapy (if not more) when the alert goes off. Occasionally we also get the 292-day alert with very low hours on the plasma chamber (last one I saw was around 149 hours).

(*Id.* at 1.)[6]

The next day, the defendant terminated the plaintiff's employment. (ECF No. 7 ¶ 49.) The plaintiff alleges that the defendant terminated him in retaliation for raising concerns about the defendant's unlawful practices. (*Id.* ¶ 50.)[7]

## II. Procedural Background

The plaintiff alleges retaliation in violation of NYLL Sections 740 and 741 and seeks lost wages and benefits, costs and attorneys' fees, a civil penalty of $10,000, and punitive damages. (*Id.* ¶¶ 58, 66.) After the defendant produced limited discovery related to the plaintiff's employment and travel expense records (*see* ECF No. 23 at 1), it moved to dismiss the complaint (ECF Nos. 24–28).

## LEGAL STANDARD

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* "Where a motion to dismiss asserts a lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) as well as other grounds for dismissal, 'the court should consider the Rule 12(b)(1) challenge first.'" *Burlington Ins. Co. v. MC&O Masonry, Inc.*, No. 17-CV-2892, 2018 WL 3321427, at *1 (E.D.N.Y. July 5, 2018) (quoting *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)). "[I]n resolving a Rule 12(b)(1) motion, 'a district

---

[6] As explained below, the Court considers the email chain because the plaintiff incorporates it by reference in the complaint, and does not object or claim that the defendant's version is inaccurate.

[7] As explained below, the Court does not consider the declaration by the defendant's head of Human Resources purporting to describe the real reason for the plaintiff's termination. (ECF No. 26 ¶ 9.) The plaintiff does not refer to it in the complaint, nor is it integral to the complaint.

court . . . may refer to evidence outside the pleadings.'" *Molokotos-Liederman v. Molokotos*, No. 23-CV-1654, 2023 WL 5977655, at *5 (S.D.N.Y. Sept. 14, 2023) (quoting *Makarova*, 201 F.3d at 113).

A party may move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) challenge, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although "detailed factual allegations" are not required, a complaint that includes only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citation modified).

A court deciding a Rule 12(b)(6) motion "accept[s] all factual allegations in the complaint as true and draw[s] all inferences in the [non-moving party's] favor." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (citation omitted). "On a motion to dismiss, a court must generally 'limit itself to the facts stated in the complaint.'" *Garcia v. ROC Nation LLC*, No. 24-CV-7587, 2025 WL 1865965, at *5 (S.D.N.Y. July 2, 2025) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006)). "'[The] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.'" *Id.* (citation modified) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).

At the motion to dismiss stage, the court "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference." *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (summary order) (quoting *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).  The court may also consider any "'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in [the] plaintiff['s] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit,'" as long as the plaintiff relied on the "terms and effect of a document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

**DISCUSSION**

I.      **Subject Matter Jurisdiction**

Although the defendant moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) (ECF No. 24 at 1), it does not explain why the Court does not have subject matter jurisdiction, or discuss the issue at all (*see* ECF No. 27).  Nor could it do so persuasively.  The defendant does not argue the Court cannot hear the plaintiff's claims at all; it argues that the plaintiff cannot bring an action under New York Labor Law.  (ECF No. 27 at 8, 12, 14–26.)  That is a Rule 12(b)(6) argument.  Moreover, the defendant does not deny that there is diversity jurisdiction.  (*See id.*)  Accordingly, the Court analyzes the claim by the 12(b)(6) standard.[8]

---

[8] The Court also denies the defendant's Rule 12(b)(1) motion to the extent it is based on the defendant's arguments that the NYLL does not apply to work performed outside of the state of New York.  "The Supreme Court has explained in a different context that extraterritoriality is a 'merits question' and does not 'raise a question of subject-matter jurisdiction.'" *Magner v. Alvanon, Inc.*, No. 24-CV-09190, 2026 WL 550017, at *3 (S.D.N.Y. Feb. 26, 2026) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253–54 (2010) (discussing extraterritorial claims under Section 10(b) of the Securities Exchange Act of 1934)).  "Moreover, New York state courts appear to treat extraterritorial claims under the NYLL as merits questions, but treat extraterritorial claims under the New York State and New York City

9

## II. NYLL Claims

### a. Records Under Consideration

The defendant submitted with its motion to dismiss a declaration by its Head of Human Resources, as well as employment records, a job description for the plaintiff's role, travel expense records, and the December 2024 email exchange between the plaintiff and the defendant's CEO. (*See* ECF Nos. 26, 26-1–26-5.) The defendant also filed a summary of the plaintiff's unemployment insurance benefits from the state of Colorado. (ECF Nos. 28, 28-1.) The defendant argues that the entire December 2024 email chain with the CEO is incorporated by reference in the amended complaint, and that the Court should consider the employment agreement, the job description, the plaintiff's travel expense records, and the plaintiff's Colorado unemployment records because they are "integral" to the complaint. (ECF No. 27 at 12–14.) The plaintiff objects only to the Human Resources declaration. (ECF No. 31 at 19–20.)

The complaint describes the circumstances of the plaintiff's employment, including the hiring process (ECF No. 7 ¶¶ 3, 13), his job responsibilities (*see, e.g.*, *id.* ¶¶ 14–15), and the CEO's December 2024 email (*id.* ¶ 47). "A document or communication may be incorporated by reference where the plaintiff expressly refers to the document or communication or otherwise relies on it in his pleadings." *Barshay v. Naithani,* 2023 WL 2051170, at *6 (S.D.N.Y. Feb. 16, 2023), *aff'd*, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023). The Court considers the email chain exhibit, because the complaint quotes parts of it, and the plaintiff does not dispute the accuracy of the defendant's exhibit. *Id.* The Court considers the employment agreement

---

Human Rights laws, in contrast, as raising subject-matter jurisdiction issues." *Id.* (citing *Kingston v. Int'l Bus. Machines Corp.*, 187 A.D.3d 578, 579 (1st Dep't 2020) (finding plaintiff failed to state a claim under the NYLL for work performed outside the state)); *see also Rodriguez v. KGA Inc.*, 155 A.D.3d 452, 453 (1st Dep't 2017) ("Since [Article 6 and Article 19 of the NYLL] do not expressly apply on an extraterritorial basis, plaintiffs' claims under these provisions, based on labor performed exclusively outside New York, do not state a cause of action.").

(ECF No. 26-1), the correspondence that led to the plaintiff's employment (ECF No. 29-1 at 2–3), and the job description (ECF No. 26-2), because they are integral to the complaint, and the plaintiff does not object to their authenticity or accuracy. (*See* ECF No. 7 ¶¶ 3, 13–15.) *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint . . . . However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." (citations omitted)). The Court does not consider the plaintiff's unemployment records, travel records, or the portions of the declaration describing the defendant's reasons for terminating the plaintiff. These exhibits are not incorporated by reference in or integral to the complaint. *See id.*

b.      **Extraterritorial Application of NYLL §§ 740 and 741**

The defendant argues that the New York Labor Law does not apply to work that is not performed in New York, and the plaintiff, an out-of-state remote worker, did not have sufficient contact with New York to warrant applying New York law. (ECF No. 27 at 14–21.) The plaintiff responds that the NYLL applies to his claims because, according to the defendant's documents, the plaintiff was employed in New York, the parties agreed in the employment agreement that New York law covered the terms of his employment, and New York law applies under choice of law principles. (ECF No. 31 at 21–26.)

"Under New York law, it is a 'settled rule of statutory interpretation, that unless expressly stated otherwise, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it.'" *Magnuson v. Newman*, No. 10-CV-6211, 2013 WL 5380387, at *5 (S.D.N.Y. Sept. 25, 2013) (citation modified) (quoting *Goshen v. Mut. Life Ins.*

11

*Co. of N.Y.*, 286 A.D.2d 229, 230 (1st Dep't 2001), *aff'd*, N.Y.2d 314 (2002)).  However, "the presumption against extraterritorial application of the NYLL does not control in all circumstances."  *Garcia*, 2025 WL 1865965, at *17 (citations omitted); *see also Hobbs v. Knight-Swift Transp. Holdings, Inc.*, No. 21-CV-1421, 2025 WL 1577271, at *16 (S.D.N.Y. June 4, 2025) ("New York courts have declined to adopt a brightline rule barring the extraterritorial application of the NYLL and instead apply New York choice of law rules to determine whether the NYLL should apply." (collecting cases)).

"New York courts apply the greate[r] interest test to determine whether the NYLL or a competing state's law applies."  *Hobbs*, 2025 WL 1577271, at *16 (citation modified) (citing *Pierre v. Gts Holdings, Inc.*, No. 15-CV-143, 2015 WL 7736552, at *2 (S.D.N.Y. Nov. 30, 2015)); *see also Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002–03 (N.Y. 1994) (applying greater interest test to resolve whether NYLL or conflicting Massachusetts law applied to a work accident that occurred in Massachusetts).  Under the greater interest test, courts "must examine whether New York, or another state, has the greatest interest with the specific issue raised in the litigation."  *Hobbs*, 2025 WL 1577271, at *16.  "To do so, the Court considers the relationship or contact of each state to the parties and to the underlying occurrence."  *Pierre*, 2015 WL 7736552, at *3 (citation modified) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 683 (N.Y. 1985)).  "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."  *Id.* at *3 (quoting *Schultz*, 480 N.E.2d at 683–84).  "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws."  *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996).  As a general matter, determining whether a plaintiff may bring claims under the NYLL's whistleblower protection provisions "is 'fact-intensive' and 'premature

to resolve at the motion to dismiss stage.'" *Garcia*, 2025 WL 1865965, at *17 (quoting *Bristol-Myers Squibb Co. v. Matrix Laboratories Ltd.*, 655 F. App'x 9, 13 (2d Cir. 2016) (collecting cases)).

At this stage of the litigation, the plaintiff has alleged a sufficient nexus between New York and his retaliation claims to survive the defendant's motion to dismiss. The defendant's records show that it hired the plaintiff for a job "based out of [the defendant's] Garden City, NY office" (ECF No. 29-1 at 2; *see also* ECF No. 26 ¶ 4; ECF No. 26-1 at 1), and used its New York office address for the plaintiff's email signature block and business cards (ECF No. 29 ¶ 7; ECF No. 29-2 at 2–3). Moreover, the parties included New York choice of law and forum selection provisions in the employment agreement, which provided that the agreement "will in all respects be interpreted, governed, and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law." (ECF No. 26-1 at 6.) It also provided that "[i]f a dispute arises out of or in connection with this Agreement or the subject matter of this Agreement, including, without limitation, regarding the breach, termination, or validity of this Agreement, Employee agrees that a claim can be brought only in a federal or state court in New York." (*Id.*)[9] The plaintiff alleges that in the course of his New York-based employment, he

---

[9] The defendant argues that the New York choice of law provision does not bind the parties for non-contractual claims. (ECF No. 27 at 19–21.) If the employment agreement included the "broad language in the choice-of-law provision . . . stat[ing] that New York law would govern any controversy 'arising out of or relating to' the contract," a choice of law provision would not "bind the parties with respect to non-contractual causes of action." *Plymack v. Copley Pharm., Inc.*, No. 93-CV-2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) (first citing *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309–10 (2d Cir. 1994); then citing *Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1082, 1089 (S.D.N.Y. 1985)). But the choice of law provision at issue here provides that "[t]his Agreement will in all respects be interpreted, governed, and enforced by the laws and courts of the State of New York, without regard to its principles of conflicts of law." (ECF No. 26-1 at 6.) It does not include the "arising out of or related to" the agreement language required to "bind the parties with respect to non-contractual causes of action." *Plymack*, 1995 WL 606272, at *5. Under these circumstances, the Court must apply the choice of law analysis for the alleged NYLL retaliation claims. *See Hobbs*, 2025 WL 1577271, at *16–17 ("In assessing the locus of the tort for purposes of the NYLL, the court treats the location of [the

raised concerns about the LungFit devices to management, and the defendant fired him for doing so. As explained above, the Court does not consider the defendant's submission about the states in which the plaintiff worked, but it does not matter in any event. The plaintiff estimates that he spent about half his time traveling to hospital customers at the defendant's direction and says that he traveled to New York for work throughout his employment. (ECF No. 29 ¶ 8.) In short, the plaintiff alleges that he worked in a job that was based in New York, and that he lost his New York employment because the defendant retaliated against him for alerting it to problems with its devices. *See Garcia*, 2025 WL 1865965, at *17 (S.D.N.Y. July 2, 2025) (citing *Smith v. Vera Inst. of J., Inc.*, No. 21-CV-6430, 2023 WL 11879682, at *16 (E.D.N.Y. Aug. 11, 2023)).[10]

The cases the defendant cites do not compel a different outcome, because those cases either address different sections of the NYLL or different statutes entirely. Some of the cases

---

plaintiff's] employment to be the relevant locus here, since the object of the statutory claims is the employment relationship." (citation modified)).

[10] *Smith v. Vera Institute of Justice, Inc.*, No. 21-CV-6430, 2023 WL 11879682 (E.D.N.Y. Aug. 11, 2023), on which the defendant relies, is different. Smith was living in New York City when he started working at Vera's Brooklyn office, but later moved to Maryland and worked remotely. *Id.* at *1. Smith alleged that his "duty station" continued to be Vera's office in New York, his email signature and business card listed Vera's New York address, and that he was supervised by and interacted with staff in New York. *Id.* Smith also cited this provision in Vera's personnel manual:

> There are some areas where law provides additional benefits or protections, and these are described below. If you work in another state and do not see any exceptions for your state listed below, this is because Vera has decided, where other states' or cities' laws are *less* protective than New York law, to extend New York treatment to staff.

*Id.* at *16. The court found that the provision was "not a standard choice-of-law provision" because it did not state that "the terms of an employment agreement or claims arising out of such an agreement are to be governed by New York law." *Id.* (citing *Warman v. Am. Nat'l Standards Inst.*, No. 15-CV-5486, 2016 WL 3676681, at *3 (S.D.N. Y July 6, 2016) (discussing a choice-of-law provision that reads "[t]his Agreement shall be governed by the laws of the State of New York, exclusive of New York's conflict of interest rules")). Instead, because "[i]t [was] not clear []what" the language "to extend New York treatment to staff" meant, and in the "absence of any factual allegations suggesting that this provision was intended to waive the need for an impact analysis under the . . . NYLL," the court recommended dismissal of the NYLL claims without prejudice and with the opportunity for additional discovery. *Smith*, 2023 WL 11879682, at *17.

address wage-related claims under Article 19 of the NYLL, not the whistleblower provisions in Article 20-C at issue in this case.  *See, e.g.*, *In re Stage Presence, Inc.*, No. 12-10525, 2019 WL 2004030 (S.D.N.Y. May 7, 2019) (upholding Bankruptcy Court's grant of summary judgment and dismissing wage-related claims brought under NYLL Art. 19); *Magnuson*, 2013 WL 5380387, at \*5 (granting summary judgment and dismissing wage-related claims brought under NYLL Art. 19); *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572 (S.D.N.Y. 2013) (citation omitted) (granting summary judgment in part and dismissing overtime claims brought under NYLL Art. 19 and Art. 6 for work performed outside New York).  "Article 19 of the NYLL . . . begins with a 'Statement of Public Policy' section stating that it was enacted to address the fact that '[t]here are persons employed in some occupations *in the state of New York* at wages insufficient to provide adequate maintenance for themselves and their families.'"  *Magnuson*, 2013 WL 5380387, at \*5 (quoting NYLL § 650).  In *Magnuson*, the court found, based on this statutory language "[i]n combination with the presumption against extraterritoriality," that the NYLL wage provisions "do[] not apply to people who work outside of the State of New York." *Id.*  But NYLL Article 20-C, which is at issue in this case, does not have similar policy statements, and, as discussed above, courts must "apply New York choice of law rules to determine whether the NYLL should apply."  *Hobbs*, 2025 WL 1577271, at \*16 (collecting cases).  The cases upon which the defendant relies "stand only for the uncontroversial proposition that a state's labor laws do not reach work done entirely and exclusively outside that state," but none of them address whether the NYLL applies to "work done by a New York-based employee of a New York company" who spends time working "out-of-state."  *Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*, No. 13-CV-6789, 2015 WL 5567073, at \*9 (E.D.N.Y. Sept. 21, 2015).

15

For the same reasons, the cases involving claims under the New York State and New York City Human Rights Laws do not support the defendant's position. *See, e.g.*, *Hoffman* v. *Parade Publ'ns*, 15 N.Y.3d 285, 291 (2010) (noting that "[t]he Legislature enacted [the State's Human Rights Law] through its invocation of 'the police power of [New York State] for the protection of the public welfare, health and peace *of the people of this state*.'" (quoting Executive Law § 290[2])); *Meilus v. Rest. Opportunities Ctr. United, Inc.*, No. 21-CV-2554, 2021 WL 4868557, at *9 (S.D.N.Y. Oct. 15, 2021) (same); *Murray v. Brag Sales Inc.*, No. 23-CV-6610, 2024 WL 4635479, at *2 (S.D.N.Y. Oct. 31, 2024) (citing *Hoffman* and affirming on reconsideration denial of NYCHRL claim based on "the bare fact that [the plaintiff] lived in New York City during the time period of his employment."); *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 42 (2d Cir. 2012) (applying *Hoffman* in analyzing NYCHRL claims).

Accordingly, "[t]he Court declines to hold that Plaintiff is barred from invoking the retaliation protections of the NYLL at this stage." *Garcia*, 2025 WL 1865965, at *17.

c.       **Scope of "Health Care Services" Under NYLL § 741**

The defendant claims that the plaintiff cannot bring a Section 741 because the defendant — a medical device manufacturer and biopharmaceutical company (ECF No. 7 ¶ 2) — is not a "health care employer," and the plaintiff is not a covered employee who performs health care services, within the meaning of the statute. (ECF No. 27 at 21–24.) The plaintiff responds that the defendant provided "health care services" when it acted "through [the] [p]laintiff," who was a covered employee because he had over "25 years of experience with inhaled nitric oxide both in and out of hospitals," "was responsible for overseeing the use of LungFit PH Devices" in hospitals, and dealt with "patient incident reports concerning the LungFit PH Devices." (ECF No. 31 at 26–28 (quoting ECF No. 7 ¶¶ 13–15).)

"NYLL § 741 is 'a statute intended to protect health care workers who complain about unsafe medical practices.'" *Trivelli v. Putnam Hosp. Ctr.*, No. 19-CV-9898, 2020 WL 7246904, at *9 (S.D.N.Y. Dec. 9, 2020) (quoting *Mayer v. Neurological Surgery, P.C.*, No. 15-CV-864, 2016 WL 347329, at *3 (E.D.N.Y. Jan. 28, 2016)).  Section 741 prohibits a "health care employer" from taking retaliatory action against "any employee" who reports what he or she "in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety."  NYLL § 741(2)(a).  Under Section 741, an "employer" is:

> any partnership, association, corporation, the state, or any political subdivision of the state which: (i) provides health care services in a facility licensed pursuant to article twenty-eight or thirty-six of the public health law; (ii) provides health care services within a primary or secondary public or private school or public or private university setting; (iii) operates and provides health care services under the mental hygiene law or the correction law; or (iv) is registered with the department of education pursuant to section sixty-eight hundred eight of the education law.

NYLL § 741(1)(b).  An "employee" under Section 741 is "any person who performs health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration."  NYLL § 741(1)(a).

"This definition of employee contains two limitations: first, it applies only to those employed by 'employer[s] . . . provid[ing] health care services,' and second, the category of covered workers is further narrowed to those 'perform[ing] health care services.'"  *Reddington v. Staten Island Univ. Hosp.*, 11 N.Y.3d 80, 90–91 (2008).  Although the statute does not define "health care" or "health care services," the New York Court of Appeals, on a question certified by the Second Circuit, has held that "to be subject to the special protections of [S]ection 741, an employee of a health care provider must 'perform[] health care services,' which means to actually supply health care services, not merely to coordinate with those who do."  *Reddington*,

17

11 N.Y.3d at 91; *see also Moynihan v. New York City Health & Hosps. Corp.*, 120 A.D.3d 1029, 1031 (1st Dep't 2014).

The defendant argues that it is not a covered "health care employer." (ECF No. 27 at 21–24.) In response, the plaintiff says only that the defendant, "through [the] [p]laintiff, provides 'health care services.'" (ECF No. 31 at 26–28). According to the plaintiff, his experience and job responsibilities made him "responsible for making knowledgeable judgments as to the quality of patient care," including "for making decisions about the use and replacement of Beyond Air's devices as to patients across the country." (ECF No. 31 at 26–28.)

An employer does not become a covered employer under Section 741, by providing health care services "through" an employee, as the plaintiff claims. *See Trivelli v. Putnam Hosp. Ctr.*, No. 19-CV-9898, 2021 WL 11700887, at *2 (S.D.N.Y. Mar. 15, 2021) (rejecting an alternative theory of liability "against a defendant that does not otherwise satisfy § 741's definition of an employer"). A plaintiff is a covered employee if he "performs health care services for and under the control and direction of" an "employer which provides health care services." NYLL § 741(1)(a)–(b). The plaintiff's description of the defendant in the complaint does not establish that it provides health care services. To allege the defendant is a covered employer, the complaint says only that it "was an 'employer' which 'provides health care services in a facility licensed pursuant to article twenty-eight or thirty-six of the public health law' within the meaning of Section 741(1)(b) of the New York Labor Law." (ECF No. 7 ¶ 61.) The plaintiff also alleges the defendant "is a biopharmaceutical and critical care company that manufactures [LungFit PH Devices]," which "are used by hospitals" — not by the defendant — "to treat critically ill patients." (*Id.* ¶ 2.)

Nor are the plaintiff's claims about the defendant's conduct sufficient to establish that the defendant was a health care employer. Those claims include: "[c]ontinuing to issue LungFit PH Devices to hospitals despite knowing a circuit board component overheated;" "[c]ontinuing to issue new versions of the LungFit PH Devices that provided inaccurate nitric oxide sensor readings due to a software issue to clinicians;" and "[p]roviding improperly validated accessories for the LungFit PH devices that had not gone through the proper procedures required for FDA approval to hospitals." (*Id.* ¶ 4.) These allegations describe an entity that supplies medical devices to hospitals, not one that provides health care services directly to patients. *See Moynihan*, 120 A.D.3d at 1030, 1033–34 (citing *Reddington*, 11 N.Y.3d at 93) (dismissing Section 741 claim because the alleged "health care services" did not include "provid[ing] treatment []or care to patients," "supervis[ing] those who provided care," or "facilitat[ing] the provision of care through resource allocation"). There is no suggestion in the complaint or the parties' submissions that the defendant itself provides health care services, as required to be a covered employer under Section 741. *See Trivelli*, 2021 WL 11700887, at *2 (dismissing Section 741 claim against a defendant because the amended complaint did not allege the defendant "independently satisfie[d] § 741's definition of an employer").

The allegations in the complaint are also insufficient to show that the plaintiff "performs health care services." *See* NYLL § 741(1)(a). The plaintiff cites his expertise, past experience, and employment, as evidence that he was "responsible for making knowledgeable judgments as to the quality of patient care." (ECF No. 31 at 26–28.) He relies on the following:

- He has "over 25 years" of "experience with inhaled nitric oxide . . . both in and outside of hospitals;"

- "As Director of Clinical Services, [he] was responsible for overseeing the use of the LungFit PH Devices," reviewing "patient incident reports," and "communicating with hospitals;" and

- He joined "biweekly calls with the engineering team that also included the CEO, COO and VP of regulatory affairs, during which the team would routinely discuss problematical issues with the device."

(ECF No. 7 ¶¶ 13–15.)

Section 741, however, "applies only to 'a[ ] person who performs health care services,'" *Reddington v. Staten Island Univ. Hosp.*, 543 F.3d 91, 93 (2d Cir. 2008) (quoting NYLL § 741(1)(a)), "which means [the employee must] actually supply health care services, not merely coordinate with those who do," *Moynihan*, 120 A.3d at 1031 (quoting *Reddington*, 11 N.Y.3d at 91). For example, in *Trivelli*, the court found that a nuclear medical technologist employed by a hospital's radiology department was a covered employee because he "administered nuclear isotopes into patients" in addition to "supervising outpatient radiology" and "dealing with patient complaints." 2020 WL 7246904, at *1, *9. In this case, the plaintiff "did not see, treat or otherwise interact with patients, nor did []he have any decision making authority regarding direct patient health care." *Moynihan*, 120 A.D.3d at 1032–33. Rather, the plaintiff coordinated with hospital staff who may or may not have been directly involved in treating patients. (*See, e.g.*, ECF No. 7 ¶ 17 ("[O]n February 27, 2024, an employee at that hospital texted Plaintiff letting him know that 'we had a device that was replaced on the 16th to fail again. It was getting real loud then had a burning plastic smell. #6 serial#[*******]. We also have #8 [*******] that supposedly couldn't pass pre-use check.'").)

Because the plaintiff and the defendant are not covered by NYLL Section 741, the Court grants the defendant's motion to dismiss the plaintiff's Section 741 claim.

### d.       Sufficiency of Whistleblower Allegations

Finally, the defendant moves to dismiss the plaintiff's Section 740 claim, arguing that he did not engage in protected whistleblowing activities.  (ECF No. 27 at 24–25.)  The plaintiff responds that the defendant misstates the pleading standard for whistleblower claims, and that his allegations are sufficient to state a Section 740 claim.  (ECF No. 31 at 28–30.)

Section 740 of the NYLL provides that "[a]n employer shall not take any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety.'"  NYLL § 740(2)(a).  "To plead a violation of Section 740, a plaintiff must allege: '(1) a retaliatory action, (2) an activity protected by the statute, and (3) a causal link between the two.'"  *Boise v. Chartwell Pharms. LLC*, No. 25-CV-8407, 2026 WL 1413263, at *4 (S.D.N.Y. May 20, 2026) (quoting *Delaney v. HC2, Inc.*, 761 F. Supp. 3d 641, 676 (S.D.N.Y. 2025)); *see also Goldberg v. Bespoke Real Est. LLC*, No. 23-CV-5614, 2024 WL 1256006, at *9 (S.D.N.Y. Mar. 25, 2024) (Section 740 requires that a plaintiff show "(1) retaliatory action, (2) activity protected by the statute, and (3) a causal link between the two." (quoting *Pierce v. Better Holdco, Inc.*, No. 22-CV-4748, 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023))).

### i.       *Retaliatory Action*

The plaintiff adequately alleges the defendant engaged in "retaliatory action."  *See Boise*, 2026 WL 1413263, at *4.  Under Section 740, "[r]etaliatory action" includes the "discharge" of an employee.  NYLL § 740(e).  Because the plaintiff alleges that the defendant terminated his

employment on December 17, 2024 (ECF No. 7 ¶ 49), his allegations satisfy the first prong of the test.  *See Boise*, 2026 WL 1413263, at \*4–5.

ii.       *Activity Protected by Section 740*

The defendant maintains that the plaintiff does not satisfy the second prong, because he does not allege that he "object[ed] to conduct prohibited by the specific law at issue," as required in the Second Circuit.  (ECF No. 27 at 24–25 (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011); *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 96 (S.D.N.Y. 2020); *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019); *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 276 (S.D.N.Y. 2025)).)  The plaintiff, on the other hand, says that the "complaint need not specify the actual law, rule or regulation violated," and must instead "identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct."  (ECF No. 31 at 28 (first quoting *Arazi v. Cohen Bros. Realty Corp.*, No. 20-CV-8837, 2022 WL 912940, at \*11 (S.D.N.Y. Mar. 28, 2022) (citation modified); then citing *Von Maack v. Wyckoff Heights Med. Ctr.*, 140 A.D.3d 1055, 1057 (2d Dep't 2016)).)

Section 740 protects an employee who "reasonably believes" that the employer's conduct "is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety."  NYLL § 740(2)(a).  "[A]t the pleading stage, a plaintiff must [ ] specify that an actual violation occurred."  *HC2, Inc.*, 510 F. Supp. 3d at 95–96 (citation omitted) (quoting *Semeraro v. Woodner Co.*, No. 17-CV-8535, 2018 WL 3222542, at \*6 (S.D.N.Y. July 2, 2018)).  The plaintiff is not required, as the defendant claims, to "make clear that he is objecting to conduct prohibited by the specific law at issue" (ECF No. 27 at 24), and the cases the defendant cites do not stand for that proposition.  For example, in *HC2, Inc. v. Delaney*, the court ruled that "[u]nder Section 740, neither the

22

complaint to the employer nor the complaint filed in court need identify the actual law, rule, or regulation the employer violated," and the complaint need only "allege conduct that, at the time, violated any law, rule or regulation." 510 F. Supp. 3d at 96–97 (citing *Tonra*, 405 F. Supp. 3d at 586). The court dismissed the Section 740 claim because the complaint did not "allege conduct that, at the time, violated any law, rule or regulation." *HC2, Inc.*, 510 F. Supp. 3d at 97.[11]

The plaintiff in this case contends that he "raised concerns to senior management about multiple practices of [the] [d]efendant that [the] [p]laintiff reasonably believed violated rules and regulations of the FDA, including failing to report malfunctions with the LungFit PH Device to the FDA and failing to follow required procedures set by the FDA." (ECF No. 7 ¶ 54.) This is sufficient to allege "activity protected by the statute," *Boise*, 2026 WL 1413263, at *4, including "conduct that, at the time, violated any law, rule or regulation," *HC2, Inc.*, 510 F. Supp. 3d at 96–97.

The plaintiff also sufficiently alleges that he engaged in "activity protected by the statute" because Section 740(2)(a) applies to employer conduct that "poses a substantial and specific danger to the public health or safety." *Boise,* 2026 WL 1413263, at *4 (citations omitted); *see also McSweeney*, 776 F. Supp. 3d at 276 (describing that "the provisions of Section 740 are disjunctive: 'a plaintiff need only prove either (1) that they reasonably believed the defendant's

---

[11] Nor do the other cases the defendant cites support its position. For example, *McSweeney v. Cohen*, 776 F. Supp. 3d 200 (S.D.N.Y. 2025), does not support the defendant's claim that the "identification requirement still applies in context of Section 740 as recently amended." (ECF No. 27 at 24.) Rather, the court held "[u]nder the new iteration of the whistleblower law [effective as of January 26, 2022], the provisions of Section 740 are disjunctive: 'a plaintiff need only prove either (1) that they reasonably believed the defendant's conduct to violate a law, rule or regulation or (2) that they reasonably believed the defendant's conduct posed a substantial and specific danger to the public health or safety.'" *McSweeney*, 776 F. Supp. 3d at 276 (quoting *Accettola v. He*, No. 23-CV-1983, 2025 WL 843412, at *7 (S.D.N.Y. Mar. 18, 2025)). And the Second Circuit did not address Section 740 at all in *Rojas v. Roman Catholic Diocese of Rochester*; it affirmed the grant of summary judgment on the plaintiff's Title VII retaliation claims based on a burden-shifting analysis that is not relevant to the plaintiff's claims in this case. *See* 660 F.3d at 108.

conduct to violate a law, rule or regulation or (2) that they reasonably believed the defendant's conduct posed a substantial and specific danger to the public health or safety.'" (citation omitted)). The plaintiff alleges that many of the defendant's devices failed during use, including a device that a heart transplant patient was using. (ECF No. 7 ¶ 17.) The plaintiff also alleges that the defendant put "at least one infant's life at risk" because of the defendant's "refus[al] to supply [hospitals] with filters with a reasonable shelf life." (ECF No. 7 ¶ 4.) Allegations of a single incident of misconduct may suffice if the misconduct represents an "inherently dangerous practice" that "might recur" in the future. *Tozzi v. Daleview Care Ctr.*, 818 F. Supp. 3d 356, 364 (E.D.N.Y. 2026) (quoting *Villarin v. Rabbi Haskel Lookstein Sch.*, 96 A.D.3d 1, 7–8 (1st Dep't 2012)).

The defendant focuses only on the plaintiff's December 17, 2024 email to the CEO, and claims that nothing in the email "would place Beyond Air on notice that it violated a regulation or statute." (ECF No. 27 at 25.) But, as explained above, the plaintiff claims that he "discussed [] device failures with senior management" and raised safety concerns "on multiple occasions." (ECF No. 7 ¶¶ 15, 42–43.) "[A]ccepting all factual allegations in the complaint as true and drawing all inferences in the plaintiff's favor," *Walker*, 717 F.3d at 124 (citation omitted), as the Court must on a motion to dismiss, the plaintiff's allegations are sufficient to state a Section 740 claim. *See Boise*, 2026 WL 1413263, at *5 (stating that NYLL Section 740 "unquestionably protects informal complaints made to an employer" (quoting *Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 239 (S.D.N.Y. 2013))).

     *iii.*    *Causation*

The defendant says that it terminated the plaintiff's employment "for downsizing purposes." (ECF No. 27 at 11 (emphasis omitted); *see also* ECF No. 26 ¶ 9.) The Court does not consider this assertion, or the declaration by the defendant's Head of HR, because the facts

are outside the "four corners" of the complaint. *Williams*, 440 F. App'x at 9. The Court's task is "to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.'" *Garcia*, 2025 WL 1865965, at *5 (citation modified) (quoting *Lynch*, 952 F.3d at 75). As explained above, the complaint sufficiently alleges that the plaintiff raised concerns about the "team's, patient, and clinician safety" "[o]n multiple occasions during his employment," and "[s]pecifically . . . discussed these device failures with senior management," such as the defendant's Clinical Manager, Vice President of Regulatory Affairs, Chief Operating Officer, and Chief Commercial Officer, and his "concerns were largely ignored or rejected." (ECF No. 7 ¶¶ 42–43.) He also alleges that the defendant "grew tired" of his concerns and "wrongfully terminated him after he suggested a better process for addressing device failures at hospitals," which the plaintiff alleges was "plainly [in] retaliation for his raising concerns about [the] [d]efendant's unlawful practices." (ECF No. 7 ¶¶ 45, 50.)

The Second Circuit has not articulated a causation standard for retaliation claims under Section 740. In the absence of controlling authority, courts in this district have looked to the framework governing Title VII retaliation claims. *See Pardo v. Tomas Infernuso DVM, P.C.*, No. 24-CV-190, 2024 WL 4276204, at *2 (E.D.N.Y. Sept. 24, 2024) (explaining that for state retaliation claims, courts have "'assum[ed] without deciding' that the Title VII standard applies to Section 740 claims" (quoting *Thacker v. HSBC Bank USA, N.A.*, No. 22-CV-07120, 2023 WL 3061336, at *7 (S.D.N.Y. Apr. 24, 2023))). Under this framework, a plaintiff may establish causation either directly, through evidence of retaliatory animus, or indirectly, by showing that the adverse action followed closely in time on the protected activity. *See Tafolla v. Heilig*, 80 F.4th 111, 125–26 (2d Cir. 2023) (stating that indirect causation can be established for retaliation claims "by showing that the protected activity was closely followed in time by the adverse

employment action." (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010))). The Second Circuit "has 'not drawn a bright line defining . . . the outer limits beyond which a temporal relationship is too attenuated to establish causation,'" and has found that "a period of several months" can support causation. *Banks v. Gen. Motors*, *LLC*, 81 F.4th 242, 277 (2d Cir. 2023) (quoting *Gorzynski*, 596 F.3d at 110; citing *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980)).

The plaintiff alleges that the defendant terminated his employment a few days after the plaintiff's team "had to replace broken LungFit PH Devices [over the] weekend in response to a request from the hospital where they were being used," and "one day after [he] expressed to senior management his intent to prepare proper guidelines to share with [the] [d]efendant's hospital customers." (ECF No. 7 ¶¶ 46, 49, 55.) As described above, the plaintiff's reports and expressions of concern are protected whistleblower activity under Section 740, and the allegations are sufficient to "show[] that the protected activity was closely followed in time by the adverse employment action." *Tafolla*, 80 F.4th at 125–26 (quoting *Gorzynski*, 596 F.3d at 110).

Accordingly, the defendant's motion to dismiss the plaintiff's Section 740 claim is denied.

**CONCLUSION**

For these reasons, the defendant's motion to dismiss the plaintiff's Section 740 claim is denied, and the defendant's motion to dismiss the plaintiff's Section 741 claim is granted.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated:  Brooklyn, New York
       July 2, 2026